1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TABARRI TOWNSEND,                         No.  1:22-cv-00590-ADA-SKO (HC)

12                   Petitioner,               **FINDINGS AND RECOMMENDATION
                                               TO DENY PETITION FOR WRIT OF**
13          v.                                 **HABEAS CORPUS**

14   ROBERT NEUSCHMID,                         **[THIRTY DAY OBJECTION DEADLINE]**

15                   Respondent.

16

17          Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned

19   pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

20          On May 18, 2020, Petitioner filed the instant habeas petition challenging a Fresno County

21   Superior Court conviction for multiple felonies.  As discussed below, the Court finds the claims

22   to be without merit and recommends the petition be **DENIED.**

23   **I.      PROCEDURAL HISTORY**

24          On August 13, 2015, Petitioner was convicted by jury trial in the Fresno County Superior

25   Court of two counts of attempted murder (Cal. Penal Code §§ 664/187(a)), two counts of assault

26   with a firearm (Cal. Penal Code § 245(a)(2)), one count of shooting at an occupied vehicle (Cal.

27   Penal Code § 246), and one count of possession of a firearm by a felon (Cal. Penal Code §

28

                                                 1

1  29800(a)(1).  (Doc. 12-2 at 211, 213.[1])  Various firearm enhancements were found true. (Doc. 12-
2  2 at 211, 213.)  On September 24, 2015, Petitioner was sentenced to an aggregate prison term of
3  80 years to life.  (Doc. 12-2 at 211, 213.)

4          Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth
5  DCA").  On February 15, 2018, the Fifth DCA vacated the sentences on counts 1 and 2 and
6  remanded the matter to the trial court for resentencing on those counts.  People v. Townsend,
7  2018 WL 898094 (Cal. Ct. App. Feb. 15, 2018).  In all other respects, the judgment was affirmed.
8  Id.  Petitioner filed a petition for review in the California Supreme Court.  (Doc. 12-14 at 1-36.)
9  Review was denied on May 16, 2018.  (Doc. 12-15 at 1.)

10         In December 2018, Petitioner was resentenced.  People v. Townsend, No. F078604, 2021
11  WL 2351171, at *1 (Cal. Ct. App. June 9, 2021).  As to count 1, Petitioner received a term of life
12  with the possibility of parole, plus 20 years for a firearm enhancement (Cal. Penal Code §
13  12022.53(c)).  Id.  In count 2, Petitioner received a term of life with the possibility of parole, plus
14  20 years for a firearm enhancement (Cal. Penal Code § 12022.53(c)).  Id.  In count 6, the upper
15  term of three years was imposed, which was to run concurrently to count 1.  Id.  On February 11,
16  2019, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Doc.
17  12-16.)  The petition was summarily denied on June 12, 2019. (Doc. 12-17.)

18         On June 9, 2021, the Fifth DCA affirmed the resentencing. (Doc. 12-20.)

19         On May 18, 2022, Petitioner filed the instant petition for writ of habeas corpus, raising 12
20  grounds for relief. (Doc. 1.)  On July 7, 2022, Respondent filed an answer to the petition.  (Doc.
21  14.)  Respondent contends claim 6 is procedurally defaulted and claim 12 is unexhausted.
22  Respondent also contends all claims are without merit.  On October 3, 2022, Petitioner filed a
23  traverse. (Doc. 22.)

24  /////
25  /////
26  /////
27

28  _____
[1] Citations are to ECF pagination.

1    **II.      FACTUAL BACKGROUND[2]**

2         A.      Relevant Facts From The Prosecution's Case.

3              1.      The shooting.

4         In the early morning hours of June 29, 2014, sometime after 2:30 a.m., Cecilia Hernandez

5    and Jose Mendoza, her boyfriend, were sitting in Mendoza's vehicle. They were parked on the

6    street in a residential neighborhood in the west side of Fresno. Hernandez was sitting on

7    Mendoza's lap in the driver's seat. The driver's door was open. While they spoke, a vehicle drove

8    past them and then returned, stopping parallel to them. The other vehicle's passenger side faced

9    them. Three men were in the vehicle.

10        At trial, both Hernandez and Mendoza identified Petitioner as the rear passenger in the

11   suspects' vehicle. They both testified that Petitioner held a gun with an attached laser beam,

12   which he aimed at Mendoza's head. They both testified at trial that the front passenger also held a

13   gun, which he aimed at them.

14        The three suspects asked Mendoza several times where he was from. They asked

15   Mendoza if he was from Strother or Eden.[3]  Petitioner asked if Mendoza was a Strother gang

16   member, which Mendoza denied.[4]  Petitioner said that Mexicans were going to die. Hernandez

17   began crying and begging for her life. The suspects told her to shut up and they opened fire.

18        Bullets struck Hernandez in her abdomen, leg and an arm. Mendoza was shot in his arm

19   and on his side. The suspects left "seconds later." Mendoza called 911 and law enforcement

20   responded at approximately 2:50 a.m. Hernandez and Mendoza were transported to a local

21   hospital.

22        Mendoza's injuries were not life threatening; he was treated at the emergency room and

23   released without surgery. Hernandez, however, underwent surgery and she was unconscious on

24

25   [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will adopt the Fifth DCA's summary of the facts set forth in Townsend, 2018 WL 898094, at *1-7.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

26   [3] Strother is approximately one block away from where this event took place. At trial, Hernandez told the jury that Strother is a gang area.

27   [4] At trial, both Mendoza and Hernandez denied that Mendoza was a gang member. No evidence was introduced suggesting that Mendoza was a gang member.

28

life support for about one week. She remained hospitalized for almost two months. She was unable to walk for six months. At Petitioner's trial, she was still going through physical therapy, and taking medications for anxiety and depression. She walked with a noticeable limp.

At trial, both Hernandez and Mendoza identified Petitioner as one of the two shooters. They were both certain of their identifications and said the other shooter was the front passenger.

2.     Evidence corroborating the eyewitness identifications.

At trial, the prosecution offered evidence that corroborated, to some degree, the victims' identifications. Based on expended cartridge casings at the shooting scene, two handguns were used in this shooting: a .45-caliber and a .9-millimeter.

After law enforcement responded to the shooting scene, other officers were on patrol at approximately 3:00 a.m. These officers spotted a vehicle that matched Mendoza's description of the suspects' car. After a brief pursuit, police took three occupants into custody: Abdray Valentine was the driver; Eric Hughley was the front passenger; and Petitioner was the rear passenger. At trial, both Hernandez and Mendoza identified a photograph of this vehicle as the shooters' car.

Police located a .45-caliber handgun under the front passenger seat of the shooters' vehicle. The recovered .45-caliber handgun did not have an attached laser beam. However, it had a railing system that permitted a laser to be attached. No other firearm was located inside that car. Subsequent testing linked this recovered .45-caliber handgun to this shooting.

At trial, the jury learned that the suspects did not immediately yield to police when officers activated their lights and sirens. The suspects drove into a dark business area before stopping. The officers did not see the suspects throw anything from the vehicle, but it was possible they did so without being seen.

Police tested the suspects for gunshot residue. Valentine (the driver) had no residue on his hands. Hughley (the front passenger) had one particle "consistent" with gunshot residue on his hands (that is, it contained two out of three possible component metals) and he had one particle "characteristic" of gunshot residue (that is, it contained all three of the required metals of lead, barium and antimony). Petitioner had no particles "characteristic" of gunshot residue on his

4

hands, but he had one particle "consistent" with gunshot residue (that is, it contained lead and antimony) on his non-dominant right hand.

During cross-examination, the prosecution's gunshot residue expert agreed that gunshot residue would "fly everywhere" inside a vehicle if a person fired a gun from that vehicle. It was possible gunshot residue would get onto surfaces in the vehicle, such as a seat, and a person could touch that seat and pick up the residue.

Although police never recovered the second gun involved in this crime, they recovered both .45-caliber and .9-millimeter expended cartridge casings from the shooters' vehicle. The expended .9-millimeter cartridge casings were recovered behind the rear passenger seat where Petitioner had been sitting. These casings matched the .9-millimeter casings found at the shooting scene.[5]

Prior to trial, Mendoza met with investigating detectives. Mendoza identified Petitioner from a photographic lineup. He also identified Valentine and Hughley. He was "certain" when making his pretrial identifications. Mendoza was able to tell the detectives where the suspects were sitting in the vehicle.

Prior to trial, law enforcement conducted an experiment at night at the scene of this crime to determine if sufficient light existed for the victims to see the shooters' faces. Officers positioned two vehicles parallel to each other in a similar fashion as occurred in this incident. A participating officer testified at trial that the lighting conditions at that location were sufficient for a person situated in Mendoza's vehicle to make a positive identification of a potential suspect in the adjoining vehicle. During cross-examination, however, the officer acknowledged that he was familiar with the detective who sat in the adjoining vehicle during the experiment. The other detective was Caucasian and did not have dark skin like Petitioner.

/////

> ### 3.   Evidence questioning the reliability of the eyewitness identifications.

---

[5] At trial, the prosecution's firearms expert explained that the smaller casings located at the shooting scene were .38–caliber and a .9–millimeter cartridge is a "nominal" .38–caliber cartridge because these bullets have the same diameter. The firearms expert agreed that the smaller casings located in the shooters' vehicle were "consistent with" and "the same caliber" as the smaller casings recovered at the crime scene.

Despite the corroborating evidence, other evidence called into question the reliability of the trial identifications.

### a. Mendoza consumed alcohol on the night in question.

On the night of the shooting, Mendoza had consumed about three 24-ounce cans of beer. At the shooting scene, right after calling 911, he told a responding police officer, Nathan Jaime, that the suspects were three or four Black males.[6] He told Jaime that there was only one shooter. While speaking with Mendoza, Jaime noticed a strong odor of alcoholic beverage emitting from Mendoza's breath.

### b. Mendoza subsequently reported that the suspects were Hispanic.

After Hernandez and Mendoza were transported to the local hospital, Jaime had a second interview with Mendoza later that same day. According to Jaime, Mendoza changed his description of the suspects. At the hospital, Mendoza claimed there were four suspects, and he said they were Hispanic. He again said there was only one shooter, whom he described as a clean-shaven Hispanic with short hair. Mendoza continued to say the shooter was the right rear passenger, who used a gun with a laser beam. According to Jaime, Mendoza was certain the suspects were Hispanic.

At trial, Jaime told the jury that, when he concluded his interview with Mendoza at the hospital, he had believed Mendoza's initial description of the suspects was likely more accurate because it occurred right after the event. Jaime, however, also confirmed that, when he interviewed Mendoza at the hospital, he had known that officers had detained three Black suspects.

### c. Hernandez and Mendoza saw the suspects from a news story.

Shortly after this crime occurred, a local news agency ran a story on television regarding the arrest of the three suspects, and the story showed their images in a picture. Mendoza saw the news story. After the story aired, Mendoza received many telephone calls from people telling him that those were "the guys." At trial, however, Mendoza told the jury that he identified the suspects

---

[6] Mendoza did not identify or describe the suspects during his 911 call.

1    based on his own memory.

2         After Hernandez woke from surgery, Mendoza showed her the news story and the

3    photograph of the suspects. Mendoza told Hernandez that the suspects were in custody. At trial,

4    Hernandez identified the photograph of the three suspects as the people involved in her shooting.

5    She told the jury that her identification was based on her own memory.

6                   d.      A neighbor, Marcus, talks about the suspects.

7         Sometime after Mendoza went home from the hospital, he spoke with a neighbor,

8    Marcus.[7] In talking to Mendoza, Marcus referred to the three suspects shown on the news. He told

9    Mendoza, "Those are the niggas who shot at you[.]"

10        After Hernandez was discharged from the hospital, she also spoke with Marcus, who told

11   her that he saw the news and he knew "those guys." Marcus told her that, on the night of this

12   shooting, he had received a message from Petitioner. The message allegedly said, "We went to go

13   shoot some niggas on Eden, him and his bitch." At trial, however, Hernandez admitted that she

14   was not sure that Petitioner actually sent this message to Marcus. Marcus did not testify at trial.

15                   e.      Hernandez's and Mendoza's inconsistent statements.

16        During the police investigation prior to trial, detectives conducted interviews with

17   Mendoza and Hernandez. Some of their statements with the detectives contained inconsistencies

18   from earlier statements and/or from eventual trial testimony.

19        According to Jaime, Mendoza initially claimed that there was only one shooter. With

20   detectives, Mendoza initially said he was only focused on the gun with the laser, which was

21   pointed at him. He did not mention a second shooter. However, eventually with the detectives,

22   and at trial, Mendoza said he saw two shooters. At trial, Mendoza claimed that he had told Jaime

23   that he saw two shooters.

24        Likewise, Hernandez told detective Luis Carrillo prior to trial that she only saw one

25   shooter, who was the right rear passenger. At trial, however, she said there were two shooters.

26        At trial, Mendoza testified that Hughley was the front passenger who fired a gun.

27   _____

28   [7] Marcus's last name was not provided.

7

According to Carrillo, however, Mendoza had claimed that Hughley was the rear passenger sitting behind the driver's seat, and Mendoza never identified Hughley as a shooter.

During pretrial interviews, Carrillo showed Mendoza a photograph of the .45-caliber handgun recovered from the suspects' vehicle. With Carrillo, Mendoza identified that firearm as the one used by the right rear passenger. At trial, Mendoza testified that this same firearm appeared to be the same "Glock" that the rear passenger held. This recovered firearm, however, was a Springfield. At trial, Mendoza said he was surprised that it was not a Glock. When asked about the missing laser, Mendoza testified that it could have been discarded.

At trial, Carrillo said he had confronted Mendoza about his previous claim that the suspects were Hispanic. During his interview with Carrillo, Mendoza claimed that Jaime must have made a mistake or had been confused. Mendoza told Carrillo that the suspects were African-American.

At trial, Mendoza explained why he might have told Jaime at the hospital that the suspects were Hispanic. During direct examination, he said the suspects tried to throw him off by saying "dog" during the crime, and he suggested that he was not thinking clearly about what happened. On cross-examination, Mendoza agreed that he thought the suspects were Hispanic because they also said "Bond Street" during the incident. He told the jury that he knew "Bond Street" referred to a gang. He told the jury that the suspects had sounded like they were Hispanic, and he claimed he told Jaime the suspects "could have been Hispanics."

At trial, Carrillo opined that the suspects yelled "Bond Street" during this incident to throw off law enforcement. Bond Street is a subset of a Fresno Bulldog gang, which is primarily Hispanic.

### f.      The lighting and inability to observe.

Mendoza testified at trial that the laser beam shined into his eyes. Despite the laser beam, he suggested that he kept his eyes open and saw the shooters.

When law enforcement responded to the shooting scene, the interior light in Mendoza's vehicle was not on despite the driver's door being open. At trial, certain photographs of the crime scene called into question the proximity and sufficiency of the light sources to the vehicles in

question. Hernandez testified that the ambient lighting was sufficient to view the suspects in their vehicle. She claimed that a light pole was across the street shining light through treetops. A neighbor's porch light was illuminated. However, she admitted that she had stated at the preliminary hearing that the street light was directly above Mendoza's vehicle, which was not correct.

### 4.     The gang evidence.

In addition to testifying as a percipient witness, Carrillo testified as a gang expert. Based on a booking admission, Carrillo opined that Petitioner was an affiliate of the "107 Hoover Crip" gang. Petitioner had denied affiliation with Strother.

At trial, Carrillo explained to the jury that the Strother criminal street gang maintains a presence in the area around this shooting. The African-American gangs in Fresno use neighborhoods for gang affiliation. Generally, two different "leagues" of Black gangs, Twamp and Mug, operate in Fresno. Approximately 15 to 20 different gangs operate within these two alliances. The Strother street gang is under the Twamp alliance. Strother is comprised of approximately 95 percent African-Americans with "a handful" of Hispanics. Some gangs, such as Hoover, operate outside of the alliances. Carrillo stated that Hoover "more or less" aligns with Twamp but he described Hoover as "a standalone gang" that did not "associate with the alliances as much."

Carrillo was asked the significance of Petitioner, as a Hoover affiliate, being in the area of this shooting. Carrillo explained that a gang member would go with fellow gang members to a certain area in Fresno looking for rival gang members. They would challenge the other person and ask them if they belonged to the rival gang. The gang members would shoot the victim regardless of how he answered the challenge. Carrillo explained that this violence improved the status of both the gang and the individual gang member.

During cross-examination, Carrillo was asked whether Hoover gets along with Strother, and he answered, "The trend of gangs within Fresno sometimes, yes. It's just based on— everything comes to money." Carrillo, however, acknowledged that he had no information that Hoover was "at odds" with Twamp or Strother when this shooting occurred.

B.      Relevant Facts From The Defense.

1.      Petitioner's trial testimony.

At trial, Petitioner recalled that he was arrested in this matter on June 29, 2014. He told the jury that, on the night of his arrest, he was at the residence of his cousin, Antwone Thompson. They drank a bottle of cognac together. Petitioner left Thompson's residence when it was late and dark outside. He did not keep track of the time. Because he did not have a car, Petitioner walked. A bus was not available.

When asked to locate Thompson's residence on a map, Petitioner admitted that he did not know its exact location. He thought it was "just a few blocks east of San Pablo." He said he normally walked to Thompson's location after taking the bus. He claimed to have been to Thompson's residence about seven times total.

According to Petitioner, he was feeling tipsy on the night in question. After leaving Thompson, he walked across city streets towards his sister's house. As he walked, he saw his uncle, Valentine, driving with Hughley, who was the front passenger. Petitioner flagged Valentine, who stopped. Petitioner asked for a ride.

At trial, Petitioner denied seeing any gun or casings when he got into the car. He said he touched the top part of a seat as he got into the car. A short time later, police stopped them.

Petitioner told the jury that he was not involved in this crime. He denied shooting either Mendoza or Hernandez. He said he told the arresting officers multiple times that he had been in Valentine's car for no more than 10 minutes. He explained that he told police this because the police said that they looked like suspects, and the police had wanted to know what they had been doing before being stopped.

During cross-examination, the prosecutor called into question the route that Petitioner reportedly took when walking from Thompson's residence towards his sister's house. The prosecutor questioned why Petitioner did not walk directly towards his sister's house before claiming he got into Valentine's vehicle. The prosecutor also questioned why Petitioner felt it was necessary to tell the officers that he had just entered Valentine's vehicle if he had no idea a crime had just occurred.

Petitioner admitted that he had previously claimed an affiliation with 107 Hoover Street Crips. He admitted that he was once "jumped" by Twamps in the Fresno County jail. The Twamps had claimed that he owed them money.

### 2.    Thompson's trial testimony.

Petitioner's cousin, Thompson, told the jury that he had not seen Petitioner since Petitioner's arrest. Thompson heard about Petitioner's arrest through a friend, who saw it on the news. According to Thompson, Petitioner visited him on the same morning as Petitioner's arrest. They drank cognac together.

Thompson agreed that it was "a regular day" when Petitioner visited. He agreed he was "a little" buzzed from the alcohol. Defense counsel asked, "So is there a particular reason why you remember that day other than you heard of his arrest [sic] next day?" Thompson said, "No."

According to Thompson, Petitioner left around 2:40 or 2:50 a.m. Thompson, however, admitted that he did not keep track of the time. Petitioner left without saying where he was going.

During cross-examination, the prosecutor asked if it was true that Thompson did not remember the exact date when he last saw Petitioner, who had been in custody since that time. Thompson agreed with that assertion. Over a defense objection, which the trial court overruled, the prosecutor stated, "So essentially your testimony is that the night that you hung out with [Petitioner] was the last night that [Petitioner] was out of custody?" Thompson agreed with that assertion, saying it was the last night he saw Petitioner. Thompson agreed that he never went to the police with information that Petitioner was with him.

On redirect, Thompson clarified that the last time he saw and spent time with Petitioner was when they drank liquor together at Thompson's apartment. Thompson confirmed that he did not know when the shooting actually occurred. He only knew that a shooting occurred and Petitioner was arrested.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

> B.      <u>Legal Standard of Review</u>

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-406).

In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  <u>Cullen v.</u>

1   Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

2   a federal court "must show that the state court's ruling on the claim being presented in federal

3   court was so lacking in justification that there was an error well understood and comprehended in

4   existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

5        The second prong pertains to state court decisions based on factual findings.  Davis v.

6   Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

7   Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

8   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

9   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

10  U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

11  factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

12  among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

13  1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

14       To determine whether habeas relief is available under § 2254(d), the federal court looks to

15  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

16  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

17  2004).  "[A]lthough we independently review the record, we still defer to the state court's

18  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

19       The prejudicial impact of any constitutional error is assessed by asking whether the error

20  had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

21  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

22  (holding that the Brecht standard applies whether or not the state court recognized the error and

23  reviewed it for harmlessness).

24       In a case where the state court decided the petitioner's claims on the merits but provided

25  no reasoning for its decision, the federal habeas court conducts "an independent review of the

26  record . . . to determine whether the state court [was objectively unreasonable] in its application

27  of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002).  "[A]lthough

28  we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle

1  v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

2        C.     Review of Petition

3        Petitioner presents twelve grounds for relief: 1) The witness certainty factor in CALCRIM

4  No. 315 violated Petitioner's right to due process and a fair trial; 2) Petitioner's due process rights

5  were violated when the expert bolstered the credibility of the witness identification testimony; 3)

6  Petitioner's right to the effective assistance of counsel was denied when trial counsel failed to

7  present an eyewitness identification expert; 4) Petitioner's right to effective assistance of counsel

8  was violated when trial counsel failed to request instructions related to suggestive identification;

9  5) Petitioner's due process rights were violated when irrelevant gang evidence was used; 6)

10  Petitioner's due process rights were violated by expert opinion evidence of gang motive and

11  intent; 7) Petitioner's due process rights were violated when the trial court allowed irrelevant

12  evidence and misstated alibi evidence during cross-examination; 8) Petitioner's due process rights

13  were violated when the trial court refused to order an expanded readback; 9) Petitioner's

14  conviction rests on testimonial hearsay in violation of his Sixth Amendment right to

15  confrontation; 10) Petitioner's right to effective assistance of counsel was violated when trial

16  counsel failed to object to testimonial hearsay statements; 11) Petitioner's right to the effective

17  assistance of appellate counsel was violated when he failed to raise the confrontation issue; and

18  12) Petitioner's Sixth Amendment right to confrontation was violated when an unqualified expert

19  gave an opinion on Petitioner's gang affiliation as well as evidence related to jail classification

20  booking document.

21        1.     The Federal Due Process Claims in Grounds 1, 2, 5-8 Were Decided on the Merits.

22        Petitioner presented his due process claims in grounds 1, 2, 5-8 on both state law and

23  federal constitutional bases.  In rejecting these claims, the Fifth DCA discussed the state law

24  components of the claims; however, the court did not expressly indicate that it was also deciding

25  the Fourteenth Amendment issues. (Doc. 12-13.)  The issue is then whether the state court

26  decision is considered a merits decision for purposes of 28 U.S.C. § 2254(d)(1) such that AEDPA

27  deference is owed.

28        The Supreme Court addressed this issue in Johnson v. Williams, 568 U.S. 289, 133 S.Ct.

1  1088, 185 L.Ed.2d 105 (2013).  In Johnson, the Supreme Court held that when a state court

2  addressed some, but not all, of a defendant's claims, there is a rebuttable presumption that the

3  state court adjudicated the unmentioned claims on the merits.  Id. at 303.  The Court

4  acknowledged that the presumption is "a strong one," but it may be rebutted "in unusual"

5  circumstances. Id. at 302.

6          As correctly argued by Respondent, there are no unusual circumstances in this case

7  rebutting the strong presumption that the Fifth DCA adjudicated Petitioner's claims on the merits.

8  Moreover, several factors support the conclusion that the state court adjudicated the federal

9  claims on the merits.  The similarities of the claims make it unlikely that the Fifth DCA decided

10  the state claim but overlooked or ignored the federal claim. Id. at 305.  In addition, Petitioner's

11  litigation strategy was to treat the state and federal claims as interchangeable.  Petitioner did not

12  petition for rehearing of the claims or otherwise argue that the state court had overlooked the

13  federal claims.  Thus, as was the case in Williams, it is "exceedingly unlikely" that the state court

14  of appeal overlooked the federal claims. Id. at 306.  Accordingly, AEDPA deference is owed to

15  the various claims.

16          2.      Ground One - Witness Certainty Factor and CALCRIM No. 315

17          In his first claim, Petitioner alleges that the state court violated his Fourteenth Amendment

18  rights by instructing the jury with CALCIM No. 315, which provides:

19          You have heard eyewitness testimony identifying the defendant. As with any other
           witness, you must decide whether an eyewitness gave truthful and accurate
20          testimony. [¶] In evaluating identification testimony, consider the following
           questions: [¶] Did the witness know or have contact with the defendant before the
21          event? [¶] How well could the witness see the perpetrator? [¶] What were the
           circumstances affecting the witness' ability to observe, such as lighting, weather
22          conditions, obstructions, distance, and duration of observation? [¶] How closely
           was the witness paying attention? [¶] Was the witness under stress when he or she
23          made the observation? [¶] Did the witness give a description, and how does that
           description compare to the defendant? [¶] How much time passed between the
24          event and the time when the witness identified the defendant? [¶] Was the witness
           asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to
25          identify the defendant? [¶] Did the witness ever change his or her mind about the
           identification? [¶] How certain was the witness when he or she made an
26          identification? [¶] Are the witness and the defendant of different races? [¶] Was
           the witness able to identify other participants in the crime? [¶] Was the witness
27          able to identify the defendant in a photographic or physical lineup? [¶] Were there
           any other circumstances affecting the witness' ability to make an accurate
28          identification? [¶] The People have the burden of proving beyond a reasonable

                                                    15

1      doubt that it was the defendant who committed the crime. If the People have not
       met this burden, you must find the defendant not guilty."

2

3    (Doc. No. 12-2 at 162-165.)

4           Both parties requested the instruction be given.  One of the questions asked in the

5    instruction was: "How certain was the witness when he or she made an identification?"  Petitioner

6    argues that because there is little correlation between a witness's level of certainty and the

7    reliability of the identification, the instruction violated his due process rights.

8           Petitioner presented the claim on appeal to the Fifth DCA.  The Fifth DCA rendered the

9    last reasoned decision.  In rejecting the claim, the Fifth DCA reasoned as follows:

10          The trial court instructed the jury with CALCRIM No. 315, which asked the jurors
            to decide whether the eyewitness identifications were truthful and accurate. This
11          instruction gave the jurors a list of questions to use in order to evaluate that
            testimony. One such question was: "How certain was the witness when he or she
12          made an identification?"

13          Appellant contends that eyewitness certainty does not indicate reliability. He cites
            a variety of sources, including out-of-state opinions, which conclude a witness's
14          certainty has no correlation to the accuracy of an identification. He argues that this
            instruction violated his rights to due process and a fair trial. We disagree.
15
            Our Supreme Court has already analyzed and rejected an argument that a
16          "certainty factor" violates due process. CALJIC No. 2.92, which is similar to
            CALCRIM No. 315, states that a jury should consider the accuracy of an
17          identification by considering, in part, certain factors. One such factor is "[t]he
            extent to which the witness is either certain or uncertain of the identification."
18          (CALJIC No. 2.92.)

19          Our Supreme Court analyzed CALJIC No. 2.92 in *People v. Johnson* (1992) 3
            Cal.4th 1183, 1231–1232 (*Johnson*) and *People v. Wright* (1988) 45 Cal.3d 1126
20          (*Wright*). *Johnson* and *Wright* specifically approved CALJIC No. 2.92, including
            its certainty factor. (*Johnson, supra*, 3 Cal.4th at pp. 1231–1232; *Wright, supra*, 45
21          Cal.3d at p. 1144.) The Supreme Court has since reiterated the propriety of
            including this factor. (*People v. Sánchez* (2016) 63 Cal.4th 411, 462 (*Sánchez*).)
22
            Our Supreme Court has acknowledged that scientific literature shows a lack of
23          correlation between the degree of confidence an eyewitness expresses in his or her
            identification and the accuracy of that identification. (*Sánchez, supra*, 63 Cal.4th at
24          p. 462; *People v. McDonald* (1984) 37 Cal.3d 351, 369 (*McDonald*), overruled on
            other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) However, our
25          Supreme Court has not struck the certainty factor from the applicable jury
            instructions. Instead, the Supreme Court has invited defendants to challenge any
26          alleged unreliability of eyewitness identifications through other means, such as
            presenting expert testimony. (*Wright, supra*, 45 Cal.3d at pp. 1153–1154.) As
27          appellant concedes, no California courts have concluded that a witness's certainty
            in his or her identification is an impermissible factor for a jury to evaluate.
28

                                            16

1

2

3

4

     The out-of-state authorities which appellant cites are not binding on this court. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490.) In contrast, we are bound by the California Supreme Court's rulings in *Sánchez*, *Wright*, and *Johnson*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In light of the Supreme Court authority, the trial court correctly instructed the jury with CALCRIM No. 315, including its "certainty factor." No due process violation occurred. Accordingly, this claim fails.

5

Townsend, 2018 WL 898094, at *7.

6

          a.     Legal Standard

7

8

     Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain

9

10

federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.

11

12

Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable,

13

14

erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of

15

16

the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a

17

18

component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir.

19

20

1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (*per curiam*) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining

21

"imminent peril" where three other instructions correctly stated the law).

22

23

     In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v.

24

Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

25

26

(1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted

27

in "actual prejudice."  Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47

28

(1998).

1          b.      Analysis

2          Petitioner fails to show that the instruction violated his due process rights, because he fails

3   to identify Supreme Court precedent which clearly holds that an eyewitness's level of certainty

4   has no bearing on the reliability of the witness's credibility.  In fact, as noted by Respondent,

5   Petitioner's theory is actually inconsistent with Supreme Court precedent.  In <u>Neil v. Biggers</u>, 409

6   U.S. 188 (1972), the Supreme Court stated that

7          the factors to be considered in evaluating the likelihood of misidentification
           include the opportunity of the witness to view the criminal at the time of the crime,
8          the witness' degree of attention, the accuracy of the witness' prior description of
           the criminal, *the level of certainty demonstrated by the witness at the*
9          *confrontation*, and the length of time between the crime and the confrontation.

10  <u>Id</u>. at 199-200 (emphasis added).  In <u>Perry v. New Hampshire</u>, 565 U.S. 228, 239 n.5 (2012), the

11  Supreme Court noted that "[a]mong factors to be considered in evaluating a witness ability to

12  make an accurate identification" is "the level of certainty demonstrated at the confrontation."  In

13  light of the fact that the Supreme Court has identified the level of certainty factor as one of the

14  essential factors to evaluate witness identification, Petitioner cannot show that the jury instruction

15  was contrary to or an unreasonable application of Supreme Court precedent. The claim should be

16  rejected.

17         Notwithstanding Petitioner's failure to demonstrate a due process violation, he fails to

18  show that the alleged error had a "substantial and injurious effect or influence in determining the

19  jury's verdict."  <u>Brecht</u>, 507 U.S. at 638.  Petitioner argues that CALCRIM No. 315 makes the

20  false association that eyewitness certainty indicates reliability.  But, as pointed out by

21  Respondent, the jury instruction did not make any correlation between the witness's level of

22  certainty and the accuracy of the identification.  The jury instruction did not inform the jury that

23  the more certain an eyewitness was of his identification, the more credible is the identification.

24  Rather, the level of certainty factor was only one of 15 factors to be considered by the jury, and

25  the weight and significance of those factors were left to the jury to decide.  Moreover, the defense

26  utilized a number of the factors in arguing that the identification was wrong.

27         Furthermore, there was substantial evidence corroborating the witness's identification.

28  The prosecutor noted that Petitioner could be convicted on the basis of the identification alone;

however, he argued, "But the jury should demand more… more facts, more evidence, to make sure that you're putting the right person away, to make sure that what the victim said on the stand, to make sure that when they pointed the finger at the Defendant that it was really him." (Doc. 12-4 at 807.)  The prosecutor noted that there was "a mountain of evidence" against Petitioner. (Doc. 12-4 at 807.)  This included: 1) Petitioner was positive for gunshot residue; 2) The cartridge casings found at the scene matched one of the guns found in the vehicle; 3) The description of the vehicle matched the actual vehicle; 4) Expended casings from two different guns were found in the vehicle, consistent with witness testimony that there were two shooters; 5) Twelve bullet holes were located in the victim's vehicle, consistent with two guns being used given that the gun located under the front seat held a maximum of ten bullets; 6) .45 casings were located in the front seat and 9mm casings were located in the backseat, consistent with where Petitioner and his accomplice were seated; 7) There was no hesitation in the victim's identifications of Petitioner and his accomplices; and 8) There was evidence that Petitioner committed the crime out of gang retaliation. (Doc. 12-4 at 1848-54.)

Based on the foregoing, the claim should be rejected.

### 3.   Ground Two – Improper Bolstering of Eyewitness Credibility

Petitioner claims that Detective Carrillo improperly bolstered victim Mendoza's eyewitness credibility by vouching for Mendoza's evolved identification of Petitioner and implying that the identifications were accurate. Petitioner raised this claim on direct review, and the Fifth DCA denied the claim in the last reasoned decision, as follows:

> Appellant contends that Carrillo improperly and prejudicially bolstered Mendoza's credibility. During his trial examination, Carrillo indicated it was common for a witness to give more information over time as things developed. The prosecutor asked him if he believed Mendoza "was able to recall more details" over time. The trial court overruled defense objections based on speculation, lack of foundation, and irrelevancy. Carrillo told the jury that he believed Mendoza "was more forthcoming" than Hernandez, who was more emotional and reluctant. Defense counsel renewed the same objections, which the trial court overruled.
>
> Outside the presence of the jury, defense counsel objected that Carrillo's testimony vouched "for witness credibility" and he moved to strike it. After hearing argument from counsel, the trial court determined that Carrillo's testimony did not rise "to the level of vouching." The court denied the motion to strike.
> On appeal, appellant contends that the trial court prejudicially erred. He argues that Carrillo opined about Mendoza's credibility and reliability.

## A. Standard of review.

We review the trial court's ruling on the admissibility of expert opinion testimony for abuse of discretion. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177.) Under this standard, we will not disturb the trial court's decision on appeal unless "'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse-of-discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

## B. Analysis.

### 1. The trial court did not abuse its discretion.

An "expert is not allowed to give an opinion on whether a witness is telling the truth because the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact. [Citations.]" (*People v. Long* (2005) 126 Cal.App.4th 865, 871; see also Evid. Code, § 801, subd. (a).)

Here, the trial court determined that Carrillo was not vouching for Mendoza. This record supports the trial court's determination. Carrillo was asked if he believed Mendoza was able to recall more details over time. Carrillo responded and expressed his opinion that Mendoza was more forthcoming with details than Hernandez, who was more reluctant and emotional. Carrillo was not asked, and he did not testify about, whether Mendoza was telling the truth. Carrillo did not discuss Mendoza's credibility.

Based on this record, the trial court's ruling was not arbitrary, capricious or patently absurd resulting in a manifest miscarriage of justice. As such, an abuse of discretion is not present and this claim fails. In any event, we also determine that any presumed error was harmless.

### 2. Any presumed error was harmless.

The harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), is used to analyze an evidentiary error that involves state law. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The question is "whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Ibid.*) The erroneous admission of evidence under state law violates due process only if it makes the trial fundamentally unfair. (*Ibid.*)

Here, assuming the trial court abused its discretion in permitting this testimony, any presumed error was harmless. Carrillo's disputed testimony about this point was very brief. It appears very unlikely that the jury would have placed much, if any, emphasis on it. Further, the trial court instructed the jurors that they "alone must judge the credibility or believability of the witnesses." The court told them that they were not required to accept an expert's opinion as true or correct. It was up to them to decide the meaning and importance of any opinion. We presume that the jurors followed these instructions. (*People v. Prince* (2007) 40 Cal.4th 1179, 1295; accord *People v. Boyette* (2002) 29 Cal.4th 381, 436.)

Based on this record, the admission of Carrillo's testimony did not result in a

20

1
2

fundamentally unfair trial. There is no reasonable probability this alleged error affected the jury's verdict. Accordingly, any presumed error was harmless and this claim fails.

3

Townsend, 2018 WL 898094, at *8-9.

4

a.      Legal Standard and Analysis

5

"Improper vouching occurs when the prosecutor places the prestige of the government

6

behind the witness by providing personal assurances of the witness's veracity.  Improper vouching

7

also occurs where the prosecutor suggests that the testimony of government witnesses is

8

supported by information outside that presented to the jury." United States v. Stinson, 647 F.3d

9

1196, 1212 (9th Cir. 2011) (citation and internal quotation marks omitted). Petitioner points to no

10

Supreme Court authority which holds that a defendant's constitutional rights are violated when a

11

witness vouches for the veracity of another witness's statements.

12

The Supreme Court discussed the subject of improper vouching by the prosecutor in

13

United States v. Young, 470 U.S. 1 (1985).  However, as one federal court observed,

14
15
16
17
18
19

the Young Court was not engaged in constitutional adjudication, but was merely reviewing a federal trial for the presence of plain error. The Court did not cite the Due Process Clause or any of its cases decided thereunder. Although the Court said that vouching can be unprofessional, it has never said that vouching is unconstitutional. Second, the Court's comments concerning this particular species of prosecutorial misconduct were clearly dictum, as the Court went on to hold that the prosecutor's error, whatever it may have been, did not affect the fundamental fairness of the trial. 470 U.S. at 20. Consequently, petitioner cannot point to any Supreme Court holding that condemns under federal constitutional principles comments by the prosecutor that may be construed as expressing a personal opinion concerning witness credibility.

20

Berry v. Berghuis, 2011 WL 1792274, at *13 (W.D. Mich. 2011).  Thus, Petitioner cannot

21

establish that the state court rejection was contrary to, or an unreasonable application of, Supreme

22

Court authority.

23

Petitioner fails to show that Det. Carrillo vouched for the veracity of Mendoza's

24

eyewitness identification.  As noted above, improper vouching occurs when the prosecutor places

25

the prestige of the government behind the witness by providing assurances of the witness's

26

veracity, or when the prosecutor suggests that the testimony is supported by information outside

27

that presented to the jury. Stinson, 647 F.3d at 1212.  No such vouching occurred here.  Rather,

28

Det. Carrillo only opined that Mendoza was more forthcoming as time passed, because the event

was traumatic in nature and sometimes witnesses are too traumatized to comprehend what happened at the time of the event. (Doc. 12-4 at 491.)  He also stated that Mendoza's girlfriend was reluctant and emotional, whereas Mendoza became more forthcoming as time passed.  This does not amount to the detective placing the prestige of the government behind the witness by providing assurances of the witness's veracity, nor does it imply knowledge of facts beyond that presented to the jury.  Petitioner fails to demonstrate that no rational fact-finder would agree with the state court's resolution of the claim.  It should be denied.

4.    Claims Three and Four – Ineffective Assistance of Counsel

Petitioner contends that defense counsel rendered ineffective assistance by failing to present an eyewitness identification expert (Claim Three) and by failing to request instructions related to suggestive identification (Claim Four).  Petitioner raised these claims on direct review, where they were denied by the Fifth DCA, as follows:

In a series of three separate but related claims, appellant contends that his trial counsel rendered ineffective assistance. First, he argues that his counsel prejudicially failed to present an eyewitness identification expert. Second, he claims his counsel prejudicially failed to request a pinpoint instruction regarding the alleged "suggestive influences" that may have affected the eyewitness identifications. Finally, he asserts his counsel prejudicially failed to request a pinpoint instruction to limit the effect of the gang evidence.

**A. Standard of review.**

Under the federal and state constitutions, a criminal defendant is entitled to the assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The constitutional right is a guarantee to effective assistance. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

**B. Analysis.**

A claim of ineffective assistance of counsel is normally raised in a writ of habeas corpus. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) In such a writ, relevant facts and circumstances can be explored which are not reflected in the record on appeal, such as why counsel did not pursue a particular trial strategy. (*Ibid.*) Our Supreme Court recommends for appellate counsel to join a verified petition for writ of habeas corpus when an ineffective assistance claim is raised on direct appeal and the record contains no explanation regarding defense counsel's actions. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.) An appellate court should not "set aside a jury verdict, and brand a defense attorney incompetent unless it can be

truly confident all the relevant facts have been developed ...." (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 267.)

Our Supreme Court has repeatedly stated that if the appellate record sheds no light on why defense counsel acted or failed to act in the challenged manner, an ineffective assistance claim on appeal must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there can be no satisfactory explanation. (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266; *People v. Kelly* (1992) 1 Cal.4th 495, 520.) An appellate court will reverse the conviction "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

We address appellant's claims with these principles in mind.

### 1. The failure to call an eyewitness identification expert.

Appellant contends that his trial counsel had no rational tactical purpose in not calling an eyewitness identification expert to testify in this trial. He relies primarily on *McDonald, supra*, 37 Cal.3d 351, to establish ineffective assistance. He argues an expert witness could have educated the jury regarding the scientific reasons why these identifications were unreliable. We disagree with appellant's contentions and find *McDonald* inapposite.

In *McDonald, supra*, 37 Cal.3d 351, the defendant argued that the trial court abused its discretion in excluding the testimony of an expert witness regarding the psychological factors that may affect the accuracy of eyewitness identification. (Id. at p. 361.) The *McDonald* court determined that error occurred because the ruling undercut the defendant's main defense, which attacked the accuracy of the eyewitness identifications. (*Id*. at p. 376.) *McDonald*, however, did not address ineffective assistance of counsel. Cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.)

Appellant does not cite, and we have not found, any legal authorities which suggest defense counsel in a criminal case *must* present an eyewitness identification expert when eyewitness identification is crucial to the prosecution's case. To the contrary, the Court of Appeal has held that *McDonald, supra*, 37 Cal.3d 351, "provides no support for the claim that expert testimony must be presented by a defense attorney in *every case* where an eyewitness identification is uncorroborated." (*People v. Datt* (2010) 185 Cal.App.4th 942, 952.) As such, *McDonald* does not dictate reversal here.

Here, we cannot determine from this record why appellant's defense counsel did not call an expert witness to testify regarding the concerns surrounding the eyewitness identifications. We note that the decision "whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess. [Citation.]" (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) "Whether to call certain witnesses is also a matter of trial tactics, unless the decision results from unreasonable failure to investigate. [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

Here, this record does not establish, and appellant does not contend, that defense counsel unreasonably failed to investigate. It is unknown whether defense counsel consulted with a potential expert witness. If defense counsel did consult with an expert witness, we could only guess regarding the scope and persuasiveness of that

23

potential testimony.

Moreover, we cannot say that there can be no satisfactory explanation to justify defense counsel's failure to present expert testimony regarding eyewitness identification. Defense counsel could have believed that the jury appeared unsophisticated so that scientific testimony would have been more confusing than helpful. Counsel could have determined that focusing on the facts, and the common sense reasons why the identifications were suspect, was more effective. Counsel could have been concerned that presenting an expert witness for the defense would have triggered rebuttal evidence from the People, which could have strengthened the case against appellant. Although we can hypothesize a tactical basis for defense counsel's conduct, that does not prove that counsel had a reasonable tactical basis for his inaction. (*People v. Jones* (2003) 30 Cal.4th 1084, 1122.) However, appellant must prove that his trial counsel had no such reasonable tactical purpose. (*Ibid*.)

Defense counsel was not asked for an explanation regarding his failure to call an eyewitness identification expert. Because the record does not reveal why defense counsel elected not to present an expert witness, appellant's claim on direct appeal must fail. (See *People v. Mitcham, supra*, 1 Cal.4th at p. 1059 [rejecting ineffective assistance claim because record did not reveal why defense counsel failed to present a defense].) Moreover, this record does not affirmatively disclose that defense counsel had no rational tactical reason for his failure to present an expert witness. Accordingly, this claim on direct appeal fails.

### 2. A limiting instruction regarding the outside sources that may have influenced the eyewitness identifications.

As noted above in section I, the trial court instructed the jury with CALCRIM No. 315. This instruction lists various factors for a jury to consider in evaluating whether the eyewitnesses "gave truthful and accurate testimony."

Appellant contends his counsel prejudicially failed to request a pinpoint instruction to be included as part of CALCRIM No. 315. He asserts that a proper instruction would have directed the jury to consider whether outside sources were unduly suggestive on the eyewitnesses and, if so, require the jurors to scrutinize the identifications. This record does not support this claim.

### a. This claim fails on direct appeal.

As an initial matter, we cannot determine from this record why appellant's defense counsel did not request a pinpoint jury instruction regarding the alleged "suggestive influences" behind the witnesses' identifications. Defense counsel was not asked for an explanation. Because the record does not reveal why defense counsel elected not to seek such an instruction, appellant's claim must fail. (See *People v. Mitcham, supra*, 1 Cal.4th at p. 1059.) Moreover, appellant has not established prejudice.

### b. Appellant has failed to establish prejudice.

In raising a claim of ineffective assistance of counsel, it is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a "reasonable probability" that absent the errors the result would have been different. (*People v. Williams* (1997) 16 Cal.4th 153, 215; see *People v. Ledesma, supra*, 43 Cal.3d at pp. 217–218.) Appellant has not demonstrated this requirement for this claim.

Here, during closing argument, defense counsel specifically referenced CALCRIM No. 315. Counsel argued that factors were present that could have influenced the witness's testimony. Counsel noted that Mendoza was "buzzed" from consuming three 24–ounce beers that night. Mendoza later saw the suspects on the news and learned their names. He spoke to Marcus, whom the jury did not meet. Marcus confirmed to both Mendoza and Hernandez that appellant was the shooter. Counsel questioned Marcus's reliability.

Defense counsel commented that this was a cross-racial identification, which was "another factor to consider[.]" Counsel argued that the lighting was poor from the victims' standpoint. When speaking with law enforcement, Mendoza was inconsistent regarding the number of shooters. Defense counsel argued that reasonable doubt was present because Mendoza's identification was based on unreliable sources.

CALCRIM No. 315 advised the jury to evaluate an eyewitness as it would any other witness. The jury was not instructed to disregard factors not listed in CALCRIM No. 315. "Reasonably viewed, CALCRIM No. 315 directed the jurors' attention to the listed factors, but permitted them to consider other factors." (*People v. Felix* (2008) 160 Cal.App.4th 849, 858–859.) Moreover, based on CALCRIM No. 226, the jury was told in pertinent part: "In evaluating a witness' testimony, you may consider *anything* that reasonably tends to prove or disprove the truth or accuracy of that testimony." (Italics added.)

The trial court's instructions regarding eyewitness identification and the factors to consider were thorough and complete. Appellant does not challenge the adequacy of the instructions given. Although the factors which appellant now contends were not expressly stated in the instructions, appellant was free to argue those points, and did so at length. As such, we reject appellant's position that his trial counsel's arguments "were emasculated" because the jurors were not given the requested pinpoint instruction. Contrary to appellant's assertion, nothing from this record suggests that the jury might have disregarded defense counsel's arguments because a pinpoint instruction was not given. We also disagree that defense counsel's arguments were in conflict with the trial court's instructions in general, or specifically in conflict with CALCRIM No. 315. To the contrary, defense counsel used trial evidence, coupled with CALCRIM No. 315, to argue how and why the eyewitness identifications were not reliable.

Based on the instructions given, defense counsel's cross-examinations, and the closing argument, appellant has not demonstrated a reasonable probability that the result would have been different had the defense requested a pinpoint instruction regarding the outside influences on the eyewitness identifications. As such, appellant has not met his burden of proof regarding prejudice. Accordingly, appellant cannot establish ineffective assistance of counsel and this claim fails.

Townsend, 2018 WL 898094, at *9-12.

> a.   Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466

25

1    U.S. 668, 687-88 (1984); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989); <u>United States v.

2    Birtle</u>, 792 F.2d 846, 847 (9th Cir.1986); <u>see also</u> <u>Penson v. Ohio</u>, 488 U.S. 75 (1988) (holding

3    that where a defendant has been actually or constructively denied the assistance of counsel

4    altogether, the <u>Strickland</u> standard does not apply and prejudice is presumed; the implication is

5    that <u>Strickland</u> does apply where counsel is present but ineffective).

6          To prevail, Petitioner must show two things.  First, he must establish that counsel's

7    deficient performance fell below an objective standard of reasonableness under prevailing

8    professional norms.  <u>Strickland</u>, 466 U.S. at 687-88.  Second, Petitioner must establish that he

9    suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

10   errors, he would have prevailed at trial. <u>Id</u>. at 694. A "reasonable probability" is a probability

11   sufficient to undermine confidence in the outcome of the trial. <u>Id</u>. The relevant inquiry is not what

12   counsel could have done; rather, it is whether the choices made by counsel were reasonable.

13   <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998).

14         With the passage of the AEDPA, habeas relief may only be granted if the state-court

15   decision unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.

16   <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

17   federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect

18   but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v.

19   Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles</u>, 556 U.S. at 123.  In effect, the AEDPA standard

20   is "doubly deferential" because it requires that it be shown not only that the state court

21   determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.

22   Gentry</u>, 540 U.S. 1, 5 (2003).  Moreover, because the <u>Strickland</u> standard is a general standard, a

23   state court has even more latitude to reasonably determine that a defendant has not satisfied that

24   standard.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

25   application was unreasonable requires considering the rule's specificity.  The more general the

26   rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

27               b.      Analysis – Failure to present eyewitness identification expert

28         Petitioner first faults counsel for failing to call an eyewitness identification expert to cast

26

1    doubt on the eyewitness testimony.  As noted by the appellate court, we do not know why defense

2    counsel did not call an identification expert.  Counsel was never asked, and there is nothing in the

3    record revealing counsel's reasoning.  Nevertheless, Petitioner fails to establish that counsel's

4    decision did not fall within the wide range of professional assistance.

5           In addressing the claim, the appellate court noted several possible reasons why defense

6    counsel did not call an eyewitness identification expert.  Defense counsel could have believed that

7    the jury appeared unsophisticated; therefore, scientific testimony would have only confused the

8    jury. Townsend, 2018 WL 898094, at *10.  Counsel could also have believed that arguing to the

9    jury's common sense rather than science was more effective. Id. Counsel could also have been

10   concerned that calling an expert would have caused the prosecution to call an expert to rebut the

11   evidence, thereby strengthening the witness identifications. Id.  Because there are a myriad of

12   reasonable arguments counsel may have had for not calling an expert, Petitioner fails to overcome

13   the strong presumption that counsel acted reasonably.  Richter, 562 U.S. at 105.

14          In addition, as the Ninth Circuit has recognized, any weaknesses in eyewitness testimony

15   can ordinarily be revealed by counsel's careful cross-examination of the eyewitness. Howard v.

16   Clark, 608 F.3d 563, 574 (9th Cir. 2010). Consequently, a defendant is not prejudiced by an

17   attorney's failure to call an eyewitness identification expert where the record establishes that the

18   "cross examination of eyewitnesses, coupled with appeals to the experience and common sense of

19   jurors, will ... alert jurors to ... conditions that render a particular eyewitness identification

20   unreliable." Howard, 608 F.3d at 574 (quoting United States v. Christophe, 833 F.2d 1296, 1200

21   (9th Cir. 1987)).  Such is the situation here.

22          Defense counsel thoroughly cross-examined the witnesses concerning their identifications.

23   (Doc. 12-4 at 284-311, 313, 341-362.)  Counsel also fully argued the unreliability of the

24   witnesses' identifications. (Doc. 12-4 at 817-848.)  In addition, the trial court instructed the jury

25   with CALCRIM No. 315 regarding the factors to be considered in evaluating witness

26   identification testimony.  In light of the instruction and defense counsel's cross-examination and

27   argument, the jury was well-informed on their task of determining the reliability of the

28   identifications.  See Ramsey v. Grounds, 2014 WL 3362346, at *13 (C.D. Cal. July 8, 2014)

(rejecting an ineffective assistance of counsel claim, explaining that "[U]nder these circumstances, the jury was sufficiently able to assess the reliability of the identifications without testimony from an eyewitness identification expert; any failure to call an eyewitness identification expert was neither unreasonable nor prejudicial."), *report and recommendation adopted*, 2014 WL 3362338 (C.D. Cal. July 8, 2014); Huang v. California, 2013 WL 5637016, at *2 (C.D. Cal. Oct. 11, 2013) (rejecting a claim that trial counsel was ineffective for failing to call an eyewitness identification expert, noting that counsel cross-examined the eyewitness and the jury was instructed to carefully evaluate the eyewitness testimony); Aguirre v. McEwen, 2012 WL 3357215, at *23 (C.D. Cal. May 14, 2012) ("Because this instruction effectively provided guidance to the jury for determining the reliability of the eyewitness identifications—and petitioner's counsel argued how the identifications were affected by these factors—petitioner has not shown that retaining an expert in the psychology of eyewitness identification would have produced a more favorable result."), *report and recommendation adopted*, 2012 WL 1977285 (C.D. Cal. June 1, 2012), *aff'd*, 596 Fed.Appx. 586 (9th Cir. 2015).

Furthermore, the claim must fail because it is entirely speculative.  Petitioner does not present any evidence that an expert would have testified, what the testimony would have been, and how the testimony would have affected the outcome in this case.  Without such proof, Petitioner cannot demonstrate that he was prejudiced by counsel's failure to call an identification expert.

In sum, Petitioner fails to show that the state court rejection was an unreasonable application of Strickland.  The claim should be denied.

### c.    Analysis – Failure to Request Limiting Instruction

Petitioner next contends that defense counsel failed to request a pinpoint instruction be included with CALCRIM No. 315 whereby the jury would have been instructed to consider whether outside sources were unduly suggestive on the eyewitnesses and their identifications.  Like the previous claim, it is not known why defense counsel did not request a pinpoint instruction, as counsel was never asked for his reasoning.  Regardless, the claim is without merit.

First, Petitioner fails to establish that counsel's decision did not fall within the wide range

of professional assistance. He submits no evidence in support of his claim and fails to overcome the strong presumption that counsel acted reasonably. Second, Petitioner fails to demonstrate any prejudice resulting from counsel's alleged error. As noted by the appellate court, the trial court thoroughly instructed the jury on identification testimony and the factors to be considered in evaluating said testimony. (Doc. 12-4 at 781-87.) Further, defense counsel specifically addressed the various factors that could have influenced the witnesses' identifications and strongly argued the identifications should not be considered credible in light of those factors. (Doc. 12-4 at 817-848.) For instance, counsel noted in his closing remarks that Mendoza saw the suspects on the news and thereby learned their names. Counsel also noted that Mendoza had spoken with Marcus, and Marcus had confirmed the identities of the shooters to him. Defense counsel fully explored Marcus's statements and called their credibility into question. Defense counsel argued that reasonable doubt was present because Mendoza's identification was unreliable. In light of the trial court's thorough instructions and defense counsel's extensive inquiry and argument concerning the identifications, Petitioner fails to demonstrate that the outcome would have been any different had the court instructed the jury further on identification testimony. The claim should be denied.

### 5. Claim Five – Admission of Gang Evidence

Petitioner next alleges the trial court violated his due process rights by admitting irrelevant gang and gang affiliation evidence. Petitioner raised the claim on direct review. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> In a series of arguments, appellant challenges the trial court's rulings permitting the introduction of gang evidence at trial. He correctly notes that the prosecution did not allege that this crime was committed to benefit a criminal street gang or that appellant was participating in criminal gang activity. (See § 186.22, subds. (a) & (b).) He asserts the gang evidence prejudicially violated his rights to due process and a fair trial.
>
> **A. Background.**
>
> Prior to trial, a hearing occurred pursuant to Evidence Code section 402 (the section 402 Hearing) regarding appellant's gang admission during a booking interview. At the section 402 Hearing, the booking officer testified that he interviewed appellant during a July 2, 2014, booking. According to the booking officer, appellant denied being a gang member, but he admitted affiliation with both the Strother gang and the 107 Hoover Crips. [Fn.7.]

[Fn.7.] This booking officer, Kong Yang, did not testify at trial.

The prosecutor argued that appellant's admitted gang affiliation was relevant to establish a motive for this shooting. The prosecutor informed the court that he intended to call a gang detective at trial to discuss the location where this crime occurred, which gang (Strother) operated in that neighborhood, and "maybe a few sentences" about Strother. Appellant objected to the introduction of his gang affiliation at trial. Defense counsel generally argued that any gang evidence would inflame the jury.

The trial court determined that the proposed evidence relating to gangs was relevant and not unduly prejudicial. The trial court ruled that appellant's booking admission regarding his gang affiliation was admissible at trial.

### B. Standard of review.

We review relevancy and Evidence Code section 352 rulings for abuse of discretion. (*People v. Weaver* (2001) 26 Cal.4th 876, 933.) Likewise, we review the trial court's ruling on the admissibility of expert opinion testimony for an abuse of discretion. (*People v. Mendoza, supra*, 24 Cal.4th at p. 177.) We will not disturb the rulings unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues, supra*, 8 Cal.4th at pp. 1124–1125.)

### C. Analysis.

Appellant raises three concerns regarding the gang evidence. First, he contends that the trial court abused its discretion in permitting the introduction of gang evidence at trial, and he suggests that the prosecutor used a false theory of relevancy during the pretrial hearing. Second, he asserts that the trial court abused its discretion in permitting Carrillo to discuss a possible gang motive for this crime. Finally, he alleges that the prosecutor misstated Carrillo's testimony during closing arguments, resulting in a fundamentally unfair trial. We address, and reject, each of these concerns. Moreover, we find any presumed error harmless.

### 1. No abuse of discretion occurred regarding the gang evidence.

In general, the prosecution is entitled to introduce evidence of gang affiliation and activity when such evidence is relevant to prove some fact other than the defendant's disposition to commit the charged crimes. (*People v. Valdez* (2012) 55 Cal.4th 82, 131; accord *People v. McKinnon* (2011) 52 Cal.4th 610, 655.) Gang evidence is admissible to prove motive or identity as long as the prejudicial effect does not outweigh its probative value. (*People v. Williams, supra*, 16 Cal.4th at p. 193.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Our Supreme Court has cautioned that trial courts should "carefully scrutinize" gang evidence, even where gang membership is relevant, because it may have a highly inflammatory impact on the jury. (*People v. Williams, supra*, 16 Cal.4th at p. 193.) On the other hand, wide latitude is permitted in admitting evidence of motive because a motive is ordinarily the incentive for criminal behavior. (*People v. McKinnon, supra*, 52 Cal.4th at p. 655.)

30

Here, this was a gang-related case. The Strother criminal street gang maintains a presence in the area around this shooting. It is undisputed that appellant was an admitted affiliate of the 107 Hoover Street Crips. The suspects made clear gang references prior to firing. They asked Mendoza several times where he was from. They asked Mendoza if he was from Strother or Eden. Appellant specifically asked if Mendoza was a Strother gang member, which Mendoza denied.

Carrillo's testimony regarding gangs was relevant. Carrillo assisted the jury in understanding the meaning and context of the gang references that the suspects uttered before opening fire. (Evid. Code, § 801, subd. (a) [expert may testify on a subject sufficiently beyond the jurors' common experience that would assist them].) Appellant's gang affiliation, coupled with his comments during this crime, suggested a possible motive for this shooting.

We reject appellant's suggestion that the prosecutor used a false theory of relevancy during the pretrial hearing. [Fn.8.] The prosecutor argued, in part, that appellant's admitted gang affiliation established a motive for this shooting. The prosecutor indicated its intent to introduce some evidence about the Strother gang and the area where this crime occurred. Nothing about the prosecutor's statements was false or misleading.

> [Fn.8.] In raising this claim, appellant notes that the trial evidence differed from the section 402 Hearing. At trial, Carrillo testified that appellant was only affiliated with the Hoover street gang. According to Carrillo, appellant had denied affiliation with Strother during the booking interview. In contrast, during the section 402 Hearing, the booking officer testified that appellant had claimed affiliation both with Strother and the 107 Hoover Crips.

Moreover, we reject appellant's argument that propensity evidence was used as an improper theory of guilt at trial. Appellant's identity as the shooter was established through the direct testimony of Hernandez and Mendoza. Other evidence corroborated their identifications. Appellant was in the shooters' vehicle shortly after this crime with a particle on his hand "consistent" with gunshot residue.

Finally, this record does not establish that the prejudicial effect of the gang evidence was outweighed by its probative value. Carrillo's testimony did not involve an undue consumption of time. This evidence did not tend to create a *substantial* danger of undue prejudice. This testimony did not have a probability to confuse the issues or mislead the jury.

In ruling that the gang evidence was admissible, the trial court did not exercise its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. An abuse of discretion is not present. As such, this claim fails.

Townsend, 2018 WL 898094, at *12-14.

           a.      Legal Standard and Analysis

This claim is not cognizable on federal habeas review because the admissibility of

evidence is a matter of state law. Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot

1   provide ground for federal habeas relief unless the admission of evidence violated due process).

2   In addition, Petitioner cannot show that the trial court's admission of gang evidence was contrary

3   to or an unreasonable application of Supreme Court precedent pursuant to 28 U.S.C. § 2254(d),

4   since there is no Supreme Court precedent governing a court's discretionary decision to admit

5   evidence as a violation of due process.  In Holley v. Yarborough, the Ninth Circuit stated:

6   > Under AEDPA, even clearly erroneous admissions of evidence that render a trial
7   > fundamentally unfair may not permit the grant of federal habeas corpus relief if not
>   forbidden by "clearly established Federal law," as laid out by the Supreme Court.
8   > 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately
>   addressed a claim, this court cannot use its own precedent to find a state court ruling
9   > unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

10  > The Supreme Court has made very few rulings regarding the admission of evidence
>   as a violation of due process. Although the Court has been clear that a writ should
11  > be issued when constitutional errors have rendered the trial fundamentally unfair,
>   see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that
12  > admission of irrelevant or overtly prejudicial evidence constitutes a due process
>   violation sufficient to warrant issuance of the writ. Absent such "clearly established
13  > Federal law," we cannot conclude that the state court's ruling was an "unreasonable
>   application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of
14  > AEDPA, we are therefore without power to issue the writ . . . .

15  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see 555 F.3d 742, 760 (9th Cir.

16  2008) (holding that trial court did not abuse its discretion in excluding expert testimony

17  "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating

18  discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly

19  established Supreme Court precedent governing a trial court's discretionary decision to admit

20  evidence as a violation of due process, habeas relief is foreclosed.  Id.

21      Even if the Court were to consider the claim, Petitioner would not be entitled to relief.

22  The gang evidence was clearly relevant to Petitioner's state of mind and motive.  The shooters

23  asked questions of the victims such as: "Where are you from?" "Where you from?" "Are you

24  from Strother?" "Where do you gang bang?" "Are you from Strother or Eden?" (Doc. 12-5 at

25  271-272, 327-328.)  These questions showed the shooting was gang-related and provided the jury

26  with context and understanding as to why a short conversation with a couple parked in a vehicle

27  could escalate to a shooting.  Because there were permissible inferences to be drawn from the

28  evidence, Petitioner was not denied a fair trial. Windham v. Merkle, 163 F.3d 1092, 1103-04 (9th

1   Cir. 1998) (holding that admission of evidence of gang involvement was relevant to prove

2   motive).  The claim should be denied.

3       6.      Claim Six – Admission of Gang Expert Testimony

4       In his sixth claim for relief, Petitioner contends his due process rights were violated by the

5   introduction of expert opinion evidence on gang motive and intent.  Petitioner also raised the

6   claim on direct review.  In the last reasoned decision, the Fifth DCA denied the claim on

7   procedural grounds and on the merits as follows:

8       At trial, the prosecutor asked Carrillo the significance of appellant, as a Hoover
        affiliate, being in the area of this shooting that night. Carrillo described a recent
9       trend of gang members going into rival gang territory with other gang members to
        confront and shoot people. Over a defense objection, which was overruled,
10      Carrillo explained the benefits, both to the shooter and to the gang, when a gang
        member goes into rival territory to commit violence.
11
        Appellant asserts that the form of the prosecutor's question was improper, as it was
12      not a hypothetical. He also contends that Carrillo's opinion testimony was
        speculative and it improperly expressed appellant's intent. He maintains that
13      reversal is required, claiming the prosecutor relied heavily on this evidence to
        persuade the jury. We disagree.
14
15          **a. Appellant failed to preserve this issue for appeal.**

16      As an initial matter, appellant failed to raise an objection in the trial court when the
        prosecutor asked Carrillo the significance of appellant, as a Hoover affiliate, being
17      in the area of this shooting that night. Appellant's failure to object forfeited that
        issue for appellate review. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 819.) We
18      reject appellant's suggestion that his previous objection, raised for a different issue,
        preserved this claim. In any event, we also reject this claim on its merits.
19
            **b. The trial court did not abuse its discretion.**
20
        Our Supreme Court has held that an expert may testify about the culture and habits
21      of criminal street gangs. (*People v. Vang* (2011) 52 Cal.4th 1038, 1044; accord
        *People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) An expert may discuss gang
22      sociology and psychology, including the expectations of gang members when
        confronted with specific action. (*People v. Hill* (2011) 191 Cal.App.4th 1104,
23      1120; accord *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370–1371.) An
        expert may testify regarding a defendant's membership in a gang; a street gang's
24      existence, composition, culture, habits, and activities; gang rivalries; whether a
        crime was committed to benefit or promote a gang; and how the crime was
25      committed. (*People v. Hill, supra*, 191 Cal.App.4th at p. 1120.) An expert may
        testify regarding a defendant's motivations for his actions. (*People v. Ward* (2005)
26      36 Cal.4th 186, 209; accord *People v. Hill, supra*, 191 Cal.App.4th at p. 1120.)

27      Generally, an expert may render opinion testimony based on hypothetical
        questions that ask the expert to assume that certain facts are true. (*People v. Vang,
28      supra*, 52 Cal.4th at p. 1045.) An expert, however, may not give an opinion based
        on assumptions of fact without evidentiary support, and opinion testimony may not

33

1    be based on speculative or conjectural factors. (Id. at p. 1046.) Likewise, an expert
     is not permitted to testify about a defendant's subjective knowledge and intent.
2    (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 658.) Although an expert may
     respond to a question that coincides with the ultimate issue in the case (see Evid.
3    Code, § 805; accord *People v. Valdez* (1997) 58 Cal.App.4th 494, 507), a witness
     may not express an opinion regarding the defendant's guilt. (*People v. Vang,*
4    *supra*, 52 Cal.4th at p. 1048.) An opinion regarding guilt or innocence does not
     assist the jurors, who must weigh the evidence and draw their own conclusions.
5    (*Ibid.*)

6    Here, we disagree with appellant that Carrillo's testimony addressed the ultimate
     mental states, and other ultimate fact/guilt issues, which were reserved for the trier
7    of fact. To the contrary, Carrillo explained to the jury the significance of
     appellant's presence in this area on the night of the shooting. Carrillo responded in
8    a neutral manner and spoke generally about a possible motive for this otherwise
     senseless act of violence. The average juror would likely not understand the
9    implications of a particular gang affiliate being in another gang's territory or how
     such violent activity could be seen as beneficial. Although Carrillo suggested a
10   motive for appellant's actions, this testimony was not tantamount to expressing an
     opinion about guilt.
11
     Finally, Carrillo's testimony was not speculative or based on an assumption of
12   facts not in evidence. The trial evidence established that the suspects all made
     gang references prior to shooting the victims. Appellant was an admitted gang
13   affiliate. This shooting occurred in another gang's territory, Strother, and appellant
     asked Mendoza if he was a Strother gang member before firing.
14
     Based on this record, the trial court's ruling was neither arbitrary, capricious, nor
15   patently absurd. Accordingly, an abuse of discretion does not appear and this claim
     fails.
16

17   Townsend, 2018 WL 898094, at *14-15.

18              a.    Procedural Default

19        The state court found that Petitioner had forfeited his claim by failing to object when the

20   prosecutor asked Carrillo the significance of Petitioner being in the area of the shooting.  A

21   federal court will not review a claim of federal constitutional error raised by a state habeas

22   petitioner if the state court determination of the same issue "rests on a state law ground that is

23   independent of the federal question and adequate to support the judgment."  Coleman v.

24   Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination

25   is based on the petitioner's failure to comply with procedural requirements, so long as the

26   procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.  For the

27   bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of

28   the [ ] purported default."  Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to

34

1    be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S.

2    1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it

3    unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

4    alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

5    fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

6          The Ninth Circuit has repeatedly held that California's contemporaneous objection

7    doctrine is clear, well-established, has been consistently applied, and is an adequate and

8    independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

9    Vansickel v. White, 166 F.3d 953 (9th Cir. 1999). Thus, by failing to object to the prosecutor's

10   question of the expert, Petitioner waived his claim in state court and is procedurally barred from

11   raising it here. In any case, as discussed below, the claim is without merit.

12                    b.      Legal Standard and Analysis

13         As previously discussed, "[u]nder AEDPA, even clearly erroneous admissions of evidence

14   that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if

15   not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley, 568

16   F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204 (9th Cir. 2021); Nava v. Diaz, No.

17   18-16165, 816 F. App'x 192, 193 (9th Cir. Aug. 12, 2020). Because the Supreme Court has not

18   clearly decided whether the admission of irrelevant, unduly prejudicial, or propensity evidence

19   constitutes a due process violation sufficient to warrant habeas relief, Holley, 568 F.3d at 1101,

20   this court cannot conclude that the state court's ruling was contrary to, or an unreasonable

21   application of, clearly established federal law. See generally, Wright v. Van Patten, 552 U.S. 120,

22   126 (2008) (per curiam); Jennings v. Runnels, 493 F. App'x 903, 906 (9th Cir. Sept. 24, 2012);

23   Bradford v. Paramo, No. 2:17-cv-05756 JAK JC, 2020 WL 7633915, at *6-7 (C.D. Cal. Nov. 12,

24   2020) (citing cases).

25         Even if the claim were considered, it lacks merit. Admission of evidence violates due

26   process only if the jury could draw no permissible inferences from the evidence. Jammal v. Van

27   de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) ("Even then, the evidence must 'be of such quality as

28   necessarily prevents a fair trial.'") Here, the state court noted that:

> [the expert] explained to the jury the significance of [Petitioner's] presence in this area on the night of the shooting. [The expert] responded in a neutral manner and spoke generally about a possible motive for this otherwise senseless act of violence. The average juror would likely not understand the implications of a particular gang affiliate being in another gang's territory or how such violent activity could be seen as beneficial.

Townsend, 2018 WL 898094, at *15.  The state court's determination was not objectively unreasonable. Federal courts allow gang evidence to prove intent and motive to commit the crime. See, e.g., Estelle, 502 U.S. at 68-69; Noel v. Lewis, 605 F. App'x 606, 609 (9th Cir. 2015); Gomez v. Pliler, 212 F. App'x 687, 691 (9th Cir. 2006); Nguyen v. Runnels, 127 F. App'x 926, 927-28 (9th Cir. 2005); Windham v. Merkle, 163 F.3d 1092, 1103-04 (9th Cir. 1998).  Petitioner was an admitted gang member.  At trial, witnesses testified that the suspects all made gang references prior to the shooting.  The shooting took place in a rival gang territory, "Strother," and Petitioner asked the victim whether he was a Strother gang member prior to shooting him.  The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority, and the claim should be denied.

      7.     Claim Seven – Prosecutor's Alleged Misleading of the Jury

      In a two-part claim, Petitioner alleges his due process rights were violated when the trial court allowed the prosecutor to mislead the jury by misstating alibi evidence.  Specifically, he asserts the prosecutor improperly went beyond the scope of direct examination when he cross-examined Petitioner on the fact he was booked and released on the night of the shooting, and then remanded to custody three days later when he appeared in court.  Relatedly, he claims the prosecutor committed misconduct by pursuing the topic on final argument.

      a.     Admission of Evidence

      The claim was raised on direct appeal.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Appellant contends that the trial court abused its discretion in allowing the prosecutor to question him at trial regarding the timeline of his jail booking. He further argues that the prosecutor committed misconduct by misstating the alibi evidence both during Thompson's cross-examination and during closing argument. He claims the "cumulative effect unfairly obliterated [his] alibi" and violated his rights to due process and a fair trial.

36

**A. Standard of review.**

We review relevancy and Evidence Code section 352 rulings for abuse of discretion. (*People v. Weaver, supra*, 26 Cal.4th at p. 933.) We will not reverse a trial court's ruling unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues, supra*, 8 Cal.4th at pp. 1124–1125.)

**B. Analysis.**

We address appellant's two issues in order.

### 1. The claim regarding cross-examination of appellant about his jail booking.

During appellant's cross-examination at trial, he agreed that he was arrested on the night of this shooting, booked, and released that same day. Several days later, on July 2, 2014, he came to court and was remanded into custody. He remained in custody from that time until his trial in this matter.

Appellant argues that these questions were not relevant to anything elicited during his direct testimony, and it did not impeach his credibility as a witness. He claims this evidence was more prejudicial than probative. We disagree.

"Although a defendant cannot be compelled to be a witness against himself, if he takes the stand and makes a general denial of the crime with which he is charged, the permissible scope of cross-examination is 'very wide.' [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 822.) The district attorney may inquire into the facts and circumstances surrounding the defendant's assertions. (*People v. Chatman* (2006) 38 Cal.4th 344, 382; accord *People v. Cooper, supra*, 53 Cal.3d at p. 822.) The district attorney may also introduce evidence through cross-examination that explains or refutes the defendant's statements or the inferences necessarily drawn from them. A defendant cannot testify contrary to and inconsistent with the prosecution's evidence and limit the scope of cross-examination to the precise facts of his direct examination. (*People v. Chatman, supra*, 38 Cal.4th at p. 382; accord *People v. Cooper, supra*, 53 Cal.3d at p. 822.)

Our Supreme Court has noted that a defendant is a percipient witness to the events at issue, and he or she has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. (*People v. Chatman, supra*, 38 Cal.4th at p. 382.) "It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination. [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 187.) However, despite the wide latitude afforded on cross-examination, a prosecutor may not ask questions that suggest facts harmful to a defendant without a good faith belief that those facts exist and can be proven. (*People v. Bolden* (2002) 29 Cal.4th 515, 562; accord *People v. Mooc* (2001) 26 Cal.4th 1216, 1233.)

Here, on direct examination, appellant offered an alibi, claiming he visited Thompson's residence on the night of this shooting. He claimed that he left Thompson's residence rather late, and he encountered his uncle, Valentine, who offered him a ride. He claimed that he did not shoot Hernandez or Mendoza, and he was in Valentine's vehicle for about 10 minutes before police stopped them.

By testifying, appellant put his own veracity at issue, and the veracity of his alibi. The prosecutor was not limited to cross-examination based solely on the precise facts that formed the basis of appellant's testimony. To the contrary, the prosecutor was entitled to question appellant on anything relevant to the alibi. The prosecutor's questions established a timeline of when appellant was in and out of custody following this shooting. This testimony established facts that, when coupled with Thompson's testimony, called into question whether appellant drank with Thompson on the night of this shooting or several days later. This evidence was material regarding appellant's guilt. As such, we reject appellant's contention that the prosecutor's questions were irrelevant.

Moreover, we reject appellant's argument that the prosecutor made no attempt to prove that appellant drank with Thompson on July 2, 2014, as opposed to the night of this shooting. To the contrary, during Thompson's cross-examination, Thompson agreed that he "hung out" with appellant on the last night that appellant was out of custody. On redirect examination, Thompson confirmed that he did not know when this shooting took place. Based on Thompson's testimony, a reasonable jury could have determined that appellant visited Thompson on a different night than when this shooting occurred. Evidence supported the prosecutor's closing argument.

Finally, the prosecutor's questions did not involve an undue consumption of time. These questions did not tend to evoke an emotional bias against appellant. These questions did not have a substantial probability to confuse the issues or mislead the jury. As such, we reject appellant's claim that prejudice substantially outweighed the probative value of the prosecutor's cross-examination.

Based on this record, the trial court did not exercise its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. An abuse of discretion is not present. Accordingly, this claim fails.

Townsend, 2018 WL 898094, at *18-19.

### 1.    Legal Standard and Analysis

This claim is also barred because of the lack of clearly established Supreme Court precedent. "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley, 568 F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204 (9th Cir. 2021); Nava v. Diaz, No. 18-16165, 816 F. App'x 192, 193 (9th Cir. Aug. 12, 2020). Because the Supreme Court has not clearly decided whether the admission of irrelevant, unduly prejudicial, or propensity evidence constitutes a due process violation sufficient to warrant habeas relief, Holley, 568 F.3d at 1101, this court cannot conclude that the state court's ruling was contrary to, or an unreasonable application of, clearly established federal law. See generally, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per

1 curiam); Jennings v. Runnels, 493 F. App'x 903, 906 (9th Cir. Sept. 24, 2012); Bradford v.

2 Paramo, No. 2:17-cv-05756 JAK JC, 2020 WL 7633915, at *6-7 (C.D. Cal. Nov. 12, 2020)

3 (citing cases).

4    Even if the claim were considered, it is plainly meritless. Admission of evidence violates

5 due process only if the jury could draw no permissible inferences from the evidence. Jammal v.

6 Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) ("Even then, the evidence must 'be of such

7 quality as necessarily prevents a fair trial.'")  In this case, the evidence was relevant to

8 Petitioner's alibi and guilt.  As discussed by the appellate court, by testifying and offering an

9 alibi, Petitioner placed the veracity of his alibi at issue.  In his line of questioning, the prosecutor

10 established a timeline of when Petitioner was in and out of custody following the shooting.

11 Petitioner's testimony, when considered with witness Thompson's testimony, called into question

12 whether Petitioner drank with Thompson on the night of the shooting or days later.  Clearly, this

13 was relevant to the veracity of Petitioner's alibi and his guilt.

14      **b.**  Prosecutorial Misconduct

15    In the last reasoned decision, the appellate court rejected the claim, as follows:

16
17 During his final rebuttal arguments, the prosecutor contended that Thompson did not know the exact date when he last saw appellant. He stated the following:

18
19
20
21
22 "[Thompson] just remembers that he hung out with [appellant] on the last night [appellant] was out of custody. That was his testimony. Because he said the day after, the day after he was in jail ever since up until today. And we heard testimony from [appellant] himself that on the night of the 29th he was booked into jail and released. He was out for a couple days. He came back several days later, July 2nd, I believe. And on July 2nd that was the last night he was out as a free man. And [Thompson] said that was the night that he hung out with him. And that's how he remembers what they did that day."

23 The trial court overruled defense counsel's objection that this argument misstated the evidence.

24
25
26 Appellant contends that the prosecutor committed misconduct because he "misstated and contorted" Thompson's testimony during his cross-examination. He further argues that misconduct occurred during closing arguments because the prosecutor misstated the alibi evidence. These contentions are unpersuasive.

27
28 As an initial matter, the parties dispute whether appellant has preserved this claim for appellate review. We decline to resolve this dispute. Even when we presume that no forfeiture occurred, we reject this claim on its merits.

A prosecutor commits prosecutorial misconduct when he or she misstates evidence during closing arguments. (*People v. Davis, supra*, 36 Cal.4th at p. 550.) However, a prosecutor has wide-ranging latitude to discuss the case in closing argument. (*People v. Panah, supra*, 35 Cal.4th at p. 463.) A prosecutor is permitted to fully state his views regarding what the evidence establishes and to urge whatever conclusions he deems proper. (*Ibid*.)

Here, the prosecutor was entitled to cross-examine Thompson regarding his memory of events, and to question whether it was possible that event occurred on a different night. The prosecution's questions to Thompson were appropriate. (*See* Evid. Code, § 773, subd. (a) [a witness may be cross-examined upon any matter within the scope of the direct examination].) Moreover, the prosecutor had latitude to discuss the case in closing argument. It was permissible for the prosecutor to state his views regarding what the evidence established and to urge whatever conclusions he deemed proper.

Nothing in this record establishes that the prosecutor misstated Thompson's testimony, either during the cross-examination or in closing arguments. Prosecutorial misconduct is not present. Accordingly, this claim is without merit.

Townsend, 2018 WL 898094, at *19-20.

### 1.    Legal Standard

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982).  If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Thompson, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

1          2.          Analysis

2          Petitioner fails to show that the prosecutor committed any misconduct, let alone

3   misconduct of constitutional magnitude. As noted by the appellate court, there is nothing in the

4   record to show that the prosecutor misstated Thompson's testimony.  Furthermore, the

5   prosecution's examination of the witness was appropriate and relevant to the veracity of

6   Petitioner's alibi, and therefore, his guilt.  In addition, the prosecutor was entitled to comment on

7   the witness's testimony in closing, and to argue what the evidence showed in his opinion.

8   Petitioner has not shown the prosecutor committed misconduct and the claim fails.

9          8.          Claim Eight – Readback of Testimony

10         Petitioner next alleges the trial court erred in instructing the jury concerning readback of

11  testimony. Petitioner claims that by requesting the readback be as specific as possible, the jury

12  was unable to request what it actually sought.  He claims the court should have granted the

13  defense's request for an expanded readback because it would not have been burdensome on the

14  court reporter's time or the jury's attention, in that it comprised merely ten pages of testimony

15  and was essential in order to satisfy the jury's interest in the date of the alibi.

16              a.          Request for Readback

17         Petitioner also raised this claim on direct appeal.  In the last reasoned decision, the Fifth

18  DCA rejected the claim, as follows:

19       During deliberations, the jurors requested a readback of certain testimony.
         Appellant claims the trial court erred both in its jury instructions regarding a
20       readback of testimony and how it responded to the jury's request for readback.

21       **A. Background.**

22       With CALCRIM No. 202, the trial court advised the jurors that they could request
         a readback of all or part of any witness's testimony if they so desired. The court,
23       however, asked the jurors to make any request "as specific as possible." The court
         noted it would be helpful if the jurors could "state the name of the witness and the
24       subject of the testimony that you would like to have read." CALCRIM No. 202
         does not include this language.
25
         During deliberations, the jury submitted a written request for readback of
26       Thompson's and appellant's testimonies, "specifically for date & time of visit, &
         time they started drinking, if mentioned." The trial court met with the parties
27       regarding this request, and the court indicated that the court reporter was locating
         the requested testimony. Defense counsel asked the court for an order directing a
28       readback of Thompson's entire trial testimony, which was relatively short. [Fn.9.]

Defense counsel argued that Thompson never mentioned a date during direct examination, but during cross-examination, Thompson testified that he knew appellant had been arrested on the night they drank together because he had heard about appellant's arrest the next day. Defense counsel argued that the jury needed to hear Thompson's entire testimony for context because the prosecutor was contending that Thompson actually drank with appellant on July 2, 2014, and not on the night of this shooting.

[Fn.9.] Thompson's entire trial testimony covers 10 pages in the record.

The trial court noted that the jury "asked specifically for date and time of visit and the time they started drinking, if mentioned." The court denied the defense request for an expanded readback, but noted that the jury could request further readback.

**B. Analysis.**

Appellant raises two issues in this claim. First, he asserts that the trial court erred in instructing the jury that readback of testimony required a request to be "as specific as possible." Second, he contends that the court erred in denying appellant's request for an expanded readback of Thompson's testimony. We address each issue in turn.

**1. The trial court did not err in asking the jury to be as specific as possible.**

Appellant argues that, because of the trial court's direction to be as specific as possible, "the jury unwittingly did not request what was actually sought." He asserts that a readback of Thompson's entire testimony would have provided the jury with the information it actually wanted. He maintains the jury was confused because the prosecutor misstated the evidence in closing argument.

As an initial matter, we agree with appellant that this claim is properly before us despite defense counsel's failure to object below to the modified language appearing in CALCRIM No. 202. Even without an objection, a defendant may appeal a jury instruction that affects substantial rights. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 505-506.) "Although the readback of testimony is primarily for the jury's benefit, it also implicates the defendant's (and prosecution's) rights. [Citation.]" (*Id.* at p. 506.) As such, we will review the merits of this claim. However, we find appellant's contentions unpersuasive.

Instructional errors are questions of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570; *People v. Jandres* (2014) 226 Cal.App.4th 340, 358.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly, supra,* 1 Cal.4th at pp. 525–526.) We must determine if it is reasonably likely the jurors understood the instruction as appellant suggests on appeal. (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.)

The Penal Code provides for the readback of trial testimony: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.)

1

2   Here, the trial court's instruction simply elaborated on the fact that, to the extent
    the jury wanted a particular portion of testimony read, it should make its request

3   with specificity. The court made it clear that the jury could hear all or some of any
    witness's testimony if it so desired. The trial court's instruction did not misstate the

4   law or misdirect the jury. It is not reasonably likely the jurors failed to understand
    their right to request a readback of testimony as they required. Based on this

5   record, there is no reasonable likelihood that the jury applied the challenged
    instruction in an inappropriate manner. As such, we decline to find instructional

6   error.

7   Townsend, 2018 WL 898094, at *20-21.

8                  1.      Legal Standard and Analysis

9          The claim fails for several reasons.  First, to the extent Petitioner is challenging the

10  application of state law, the claim is not cognizable. It is well-settled that federal habeas relief is

11  not available to state prisoners challenging state law.  Estelle, 502 U.S. at 67 ("We have stated

12  many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day,

13  110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not

14  cognizable in federal habeas corpus" proceedings).  Second, like previous claims, Petitioner fails

15  to show a violation of clearly established Supreme Court precedent. Because there is no Supreme

16  Court authority governing trial court instructions on the readback of testimony to a jury,

17  Petitioner cannot establish that the trial court's instruction was contrary to, or an unreasonable

18  application of, Supreme Court authority.

19         Even if the claim were considered on the merits, it fails.  As correctly noted by

20  Respondent, the Ninth Circuit has noted that a trial court has "great latitude to address requests

21  for readbacks."  United States v. Medina Casteneda, 511 F.3d 1246, 1249 (9th Cir. 2008); see

22  also United States v. Nolan, 700 F.2d 479, 486 (9th Cir.1983) (finding no error in the court's

23  refusal to have testimony reread and recognizing that the decision enjoys a great deal of

24  discretion).  In Medina Casteneda, the Ninth Circuit held that a judge's decision to discourage

25  readback of testimony was not an abuse of discretion. Medina Castaneda, 511 F.3d at 1149.  In

26  this case, the court did not deny or discourage readback of testimony, but merely advised the jury

27  to be specific in its request.  As pointed out by Respondent, the court repeatedly informed the jury

28  that it could have all or part of the testimony of any witness read back.  (Doc. 12-2 at 145, 151.)

                                            43

1    In light of this, Petitioner fails to demonstrate any abuse of discretion by the trial court.  The

2    claim should be denied.

3                    b.      Extent of Readback

4           Petitioner also claims that the trial court erred by denying his request for a full readback of

5    Thompson's testimony.  The appellate court rejected the claim, as follows:

6           **2. The trial court did not err regarding the readback of Thompson's
            testimony**.
7

8           Appellant next contends that the trial court erred in failing to direct the complete
            readback of Thompson's brief trial testimony. He asserts that this missing evidence
            failed to put the alibi defense into context. We find no error.
9

10          A trial court must allow the rereading of relevant testimony as requested by the
            jury. (*People v. Cox* (2003) 30 Cal.4th 916, 968, *overruled on other grounds by*
11          *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) A trial court may provide
            more information than the jury requests in order to provide context. (*People v.*
12          *Cox, supra*, 30 Cal.4th at p. 968.) However, a trial judge does not have to order
            readback of testimony that the jury did not request. (*People v. Gordon* (1963) 222
            Cal.App.2d 687, 689.)
13

14          Here, we reject appellant's contentions as speculative regarding what the jury
            actually wanted to hear. The trial court told the jury on two separate occasions that
15          it could request readback of testimony. The court instructed the jurors that they
            were free to request "all or part of the testimony of any witness read back to you."
16          The trial court provided a readback of testimony that directly complied with the
            jury's request. After receiving this readback, the jury could have requested
17          additional testimony if it so desired. It is clear, however, that the jury was satisfied
            with the readback it received.

18          Based on this record, the trial court complied with the mandates of section 1138.
            Accordingly, error is not present and this claim fails.
19

20   <u>Townsend</u>, 2018 WL 898094, at *21-22.

21          This claim also fails for the same reasons above.  Federal habeas relief is unavailable for

22   errors of state law, <u>Estelle</u>, 502 U.S. at 67-68, and Petitioner fails to identify any Supreme Court

23   precedent providing a right to an expanded readback.  <u>Musladin</u>, 549 U.S. at 74.  In addition, the

24   Court does not find that the trial court abused its discretion in denying an expanded readback of

25   testimony.  The jury asked for a readback of certain testimony.  The trial court complied with the

26   request and provided the jury with a readback of testimony it requested.  The jury did not follow

27   the request with any further requests; thus, it is apparent the jury was satisfied with the readback

28   provided.  Petitioner's assertion that a full readback of Thompson's testimony would have better

1    satisfied the jury is speculation.  Accordingly, the claim should be denied.

2         9.       Claims Nine, Ten, Eleven – Right to Confrontation

3         In three related claims, Petitioner alleges his right to confrontation was violated when the

4    prosecutor elicited testimonial hearsay statements from Mendoza and Hernandez concerning

5    discussions they had with their friend Marcus.  In claim nine, Petitioner alleges his conviction

6    rests on testimonial hearsay in violation of his right to confrontation. In claim ten, he claims he

7    was denied effective assistance of counsel when defense counsel failed to object to testimonial

8    hearsay statements.  In claim eleven, he alleges his right to effective assistance of appellate

9    counsel was violated when appellate counsel failed to raise the confrontation clause claim.

10        These claims were presented to the California Supreme Court, which denied the claims in

11   a summary order.  (Doc. 12-17.)  When the California Supreme Court denies a claim summarily,

12   it is presumed to be on the merits.  Richter, 562 U.S. at 99.  "Where there is no reasoned state

13   court decision addressing a claim, we must consider what arguments or theories could have

14   supported the state court's summary denial, and then ask whether it is possible that fair-minded

15   jurists could conclude that those arguments or theories are consistent with [Supreme Court

16   precedent]." Richter, 562 U.S. at 96, 102.

17            a.       Background

18        The defense case centered on alleged misidentification and identification based on

19   unreliable sources.  Victim Mendoza testified that after the shooting he spoke to someone named

20   Marcus. (Doc. 12-4 at 352.)  Referring to the defendants, Marcus told Mendoza, "Those are the

21   niggas who shot at you."  (Doc. 12-4 at 352.)  Victim Hernandez testified that after she returned

22   home from the hospital, Marcus approached her and told her. "Yeah, I seen the news. I know

23   those guys." (Doc. 12-4 at 368.)  Marcus also told her that he received a text message the night of

24   the shooting from Petitioner that stated, "We went to go shoot some niggas on Eden, him and his

25   bitch." (Doc. 12-4 at 368.)

26        Defense counsel used this evidence in support of his main argument that the

27   identifications were faulty and unreliable.  Defense counsel commenced his opening statement as

28   follows:

Good morning, ladies and gentlemen. Thanks for being here.

As [the prosecutor] has told you, you will be here with us about a week and a half or two weeks. And I would appreciate your careful attention and open mind - - open mindedness to the end of the trial.

This case is about identification of the suspects, specifically person that was shooting from right rear passenger seat of that dark color Toyota Corolla. That's what this case is about. And evidence will show that identification of [Petitioner] as the person who was shooting from right rear passenger seat is inaccurate, inconsistent, and was tainted. It was tainted by unreliable sources. And it was tainted by hearsay. That's what this case is about.

(Doc. 12-4 at 256.)

During examinations of the witnesses, defense counsel vigorously challenged their identifications. Defense counsel pointed out the changing descriptions of the shooters and inconsistencies in the witnesses' statements. (Doc. 12-4 at 343-361, 368-369.)  Counsel thoroughly cross-examined the witnesses concerning the fact that Marcus had told them who the shooters were. (Doc. 12-4 at 352-353, 361-362, 368-369.)

During closing argument, defense counsel again focused on the hearsay evidence as basis for his argument that the identifications were tainted, inaccurate and unreliable.  Defense counsel first stated:

First of all, ladies and gentlemen, in the beginning of this case, opening, I said this case is about identification. Misidentification.· Inaccurate identification.· Wrongful identification.· Identification, but tainted by unreliable sources.· That's what this case is about.· And that's what I'm going to talk about today, ladies and gentlemen.

(Doc. 12-4 at 817.)

Later, defense counsel returned to the subject of the identifications:

This case, ladies and gentlemen, is not a gang case. The D.A. prosecutor tried to make it a gang case because they want to pin up on your prejudice against gang. And nobody likes gangs anyway; right? But this is not a gang case. This is about identification. And here's why. This case is inundated with wrong ID, mistaken ID, inconsistent identification, and ID influenced by, tainted by, unreliable sources like Marcus, like ABC Channel 30. I'll explain to you why.

(Doc. 12-4 at 829.)  And again:

He also spoke to Marcus. I don't know who Marcus is. Have you met Marcus?  Have you hear how he got information? Is he reliable? Is he another gang-banger? I don't know who he is.   But he said Marcus said it was three Black people. Those are the

1

-- and excuse me for my verbiage, I'm going to say what he heard -- "Those are the three niggers that shot at you and your girlfriend." Ms. Hernandez heard that, too.

2

3

Is this reliable? Is this reliable enough for you to convict this man of an attempt murder charge?

4

(Doc. 12-4 at 839.)

5

b.      Legal Standard

6

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

7

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him

8

. . . ." U.S. Const., Amend. VI.  The Confrontation Clause bars "admission of testimonial

9

statements of a witness who did not appear at trial unless he was unavailable to testify, and the

10

defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S.

11

36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause

12

applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"  Crawford, 541

13

U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24.  "'Testimony,' in turn, is typically a

14

solemn declaration or affirmation made for the purpose of establishing or proving some fact."

15

Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at

16

824.  Nevertheless, the Confrontation Clause "does not bar the use of testimonial statements for

17

purposes other than establishing the truth of the matter asserted."  Crawford, 541 U.S. at 59 n. 9.

18

Additionally, a Confrontation Clause violation is subject to harmless error analysis.  Delaware v.

19

Van Arsdall, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless, and does

20

not justify habeas relief, unless it had substantial and injurious effect or influence in determining

21

the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

22

c.      Analysis

23

Here, as noted by Respondent, the Confrontation Clause is not implicated because the

24

alleged hearsay was not offered *against* the Petitioner.  It was in fact key to the defense argument

25

that the identifications were unreliable.  That being so, the introduction of the statements did not

26

constitute a Sixth Amendment violation. See Lilly v. Virginia, 527 U.S. 116, 130 (1999) (where

27

hearsay statements are "offered by the accused, the admission of such statements does not

28

implicate Confrontation Clause concerns"); United States v. Parikh, 858 F.2d 688, 695 (11th Cir.

47

1988) (citing United States v. DiMaria, 727 F.2d 265, 272 n. 6 (2d Cir.1984)) ("The confrontation clause is not implicated where the defendant seeks to introduce hearsay declarations as part of his defense.").

Because Petitioner's confrontation clause argument is meritless, his claims of ineffective assistance of defense counsel and appellate counsel for their failures to raise the claim necessarily fail as well.  The failure to take a futile action or make a meritless argument can never constitute deficient performance.  See Rupe v. Wood, 93 F.3d 1434, 1444-45 (9th Cir. 1996); see also Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (counsel is not obligated to raise frivolous motions, and failure to do so cannot constitute ineffective assistance of counsel); Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

For the foregoing reasons, claims nine, ten and eleven should be denied.

> 10.   Claim Twelve – Right to Confrontation

In his final claim, Petitioner alleges his Sixth Amendment right to confrontation was violated when Detective Carrillo relied on hearsay – a jail classification booking document – when he offered his opinion on Petitioner's gang affiliation.  Petitioner has not presented the claim to any state court.  Thus, it is unexhausted.  In addition, it is without merit.

> > a.   Exhaustion

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.  Duncan v. Henry, 513 U.S. 364, 365 (1995).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  Duncan, 513 U.S. at 365 (legal basis); Kenney

48

1    v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct. 1715, 1719 (1992) (factual basis).

2           Here, Petitioner has not presented his claim to any state court.  Therefore, Respondent

3    correctly argues that it is unexhausted.  Regardless, as discussed below, the claim is without

4    merit.

5                  b.      Legal Standard and Analysis

6           As previously noted, the Confrontation Clause of the Sixth Amendment guarantees the

7    right of an accused in a criminal prosecution to cross-examine witnesses against him or her.

8    Delaware, 475 U.S. at 678.  In Crawford, 541 U.S. at 68, the United States Supreme Court held

9    that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is

10   unavailable and the accused had "a prior opportunity for cross-examination."  Statements given to

11   police during interrogations qualify as "testimonial."  Id. at 59, 68.

12          In this case, however, the statements were Petitioner's own, as provided to law

13   enforcement on a booking sheet.  Since Crawford, courts have found that the Confrontation

14   Clause is not implicated when a criminal defendant's own incriminating statement is used against

15   him during criminal proceedings.  See, e.g., United States v. Crowe, 563 F.3d 969, 976 n. 12 (9th

16   Cir. 2009) (Admission of defendant's own statements raised no Confrontation Clause concerns);

17   United States v. Romo-Chavez, 681 F.3d 955, 961 (9th Cir. 2012) (Sixth Amendment right to

18   confrontation is not implicated where an officer's translations were properly construed as the

19   defendant's own statements); Vasquez v. Kirkland, 572 F.3d 1029, 1037 (9th Cir. 2009) ("cases

20   involv[ing] the use of a defendant's own statements against him ... implicate a defendant's Fifth

21   Amendment rights rather than the Sixth Amendment right of confrontation"), *cert. denied*,

22   Vasquez v. Kirkland, 558 U.S. 1126 (2010); United States v. Brown, 441 F.3d 1330, 1358-59

23   (11th Cir. 2006) (admission of defendant's statement did not violate Confrontation Clause as "a

24   party cannot seriously claim that his or her own statement should be excluded because it was not

25   made under oath or subject to cross-examination") (citation omitted); United States v. Tolliver,

26   454 F.3d 660, 665 (7th Cir. 2006) (Confrontation Clause not applicable to the defendant's

27   statements), *cert. denied*, Dunklin v. United States, 549 U.S. 1149 (2007); United States v.

28   Lafferty, 387 F.Supp.2d 500, 511 (W.D.Pa. 2005) (citing Crawford, 541 U.S. at 42-60) ("Inherent

in Justice Scalia's analysis in the <u>Crawford</u> opinion was the idea that the right of confrontation exists as to accusations of third parties implicating a criminal defendant, not a criminal defendant implicating herself."). Thus, because a defendant's own statements may be used against him without implicating the Confrontation Clause, Petitioner's claim must fail.

In addition, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." <u>See</u> <u>Crawford</u>, 541 U.S. at 59 n. 9; <u>Moses v. Payne</u>, 543 F.3d 1090, 1100 (9th Cir. 2008) (admission of victim's son's out-of-court statements to treatment provider introduced for purpose of showing why provider contacted child protective services not made inadmissible by <u>Crawford</u> as they were not offered for truth of matter asserted).  Here, the evidence relating to Petitioner's alleged gang membership was not admitted for the truth of the matter.  Rather, the statements were admitted only as evidence supporting Detective Carrillo's opinion that Petitioner was a gang affiliate of the 107 Hoover Crip gang.  Thus, Petitioner's right to confrontation under <u>Crawford</u> was not violated. <u>See</u>, <u>e.g.</u>, <u>Ortiz v. Tilton</u>, 2008 WL 2543440, at *16 (S.D.Cal. May 5, 2008) (admission of "field investigation reports, admissions by Ortiz and Garcia as to their gang member status, and other hearsay matters as bases for his opinions did not violate <u>Crawford</u> because those items were not admitted for the truth of the matter asserted"), *report and recommendation adopted at* 2009 WL 88351; <u>Nguyen v. Evans</u>, 2008 WL 1994902, at *5 (N.D.Cal. Feb.8, 2008) (<u>Crawford</u> inapplicable where petitioner failed to meet burden of establishing that testimonial statements supporting expert opinion were introduced for the truth of the matter); <u>Eddington v. Adams</u>, 2008 WL 397290, at *9 (E.D.Cal. Feb.8, 2008) (admission of statement that petitioner was gang member was not admitted for truth of matter but as support for expert's opinion that petitioner was a gang member).

Thus, the claim is unexhausted and clearly without merit.  It should be denied.

## IV.    RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **November 28, 2022**                    /s/ *Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE